IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| William O. Dickerson, | ) | Case No. 9:22-cv-108-SAL |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Bryan P. Stirling, *Director, South Carolina Department of Corrections*, and Lydell Chestnut, *Deputy Warden of Broad River Correctional Secure Facility*, | ) ) ) ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner, William O. Dickerson, brought this action pursuant to 28 U.S.C. § 2254, seeking relief from his state court convictions and death sentence. [ECF No. 1.] The matter is now before the court on Respondents' Motion for Summary Judgment. [ECF No. 78.] Also pending are two motions to strike by Respondents. [ECF Nos. 80, 99.] Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2), D.S.C., pre-trial proceedings were referred to the Honorable Molly H. Cherry, United States Magistrate Judge. The court has unreferred the motions for consideration without a Report and Recommendation. [ECF No. 110.] For the reasons set forth below, Respondents' motions are GRANTED.

## BACKGROUND

The following are the facts of twenty-nine-year-old Gerard Roper's murder, as found by the Supreme Court of South Carolina in its order affirming Dickerson's convictions and sentences on direct appeal.

> Dickerson and Gerard Roper had been friends, even best friends, since childhood. On the morning of March 6, 2006, Roper went to his friend, Ben Drayton's, house to play video games. Around the same time, Dickerson went to his friend, Antonio Nelson's, house asking for a ride to his brother, Armon Dickerson's, house. Nelson

1

was unable to give Dickerson a ride at that time and told Dickerson to come back later. When Dickerson returned later that afternoon, he was carrying a gun.

En route to Armon's house, however, Dickerson began calling Roper from his cell phone. After receiving no answer, Dickerson asked if they could make a stop at Drayton's house so he could "get some money." When they arrived at Drayton's home, Dickerson entered brandishing his weapon and asking for money. Roper told Dickerson "I got your money," begging "don't shoot me" and "please don't kill me." Dickerson nevertheless fired a shot at Roper but missed. He then struck Roper in the head with the gun, dragged him out of the house, and forced him into Nelson's car. Dickerson then took Roper to Armon's house.

Armon and Dickerson brought Roper inside and systematically tortured him over approximately thirty-six hours. It started with Dickerson continuing to hit Roper with the gun, knocking out some of his teeth. Armon then left to retrieve Dickerson's car and some drugs, and blood covered the inside of the house when he returned. Dickerson then called another friend of his, Rashid Malik, and threatened him with death if he did not come to Armon's house. When Malik arrived, Roper was still conscious but clothed only in his T-shirt, and Armon was attempting to clean up the blood covering the house. Malik then joined Armon and Dickerson.

Although Dickerson, Armon, and Malik all tortured Roper to varying degrees, Dickerson appeared to be the primary actor. Through this entire ordeal, Roper suffered the following at the hands of Dickerson alone: choking, being tied up and placed in a closet, being sodomized with a gun and a broomstick, having his scrotum burned, being hit with a heavy vase and a mirror, and generalized beating and cutting. At one point, Roper began asking that they just let him die.

All told, Roper received over 200 individual wounds to the outside of his body, including lacerations to his anus. He also received several internal injuries, including various broken bones in his face that caused it to appear misshapen, blunt force trauma to his neck resulting in the breaking of various structures, a broken tibia, broken fingers and wrist, brain swelling, and bleeding into the internal structures around his rectum as the result of objects being inserted into it. Although there is no definite timeline of events, Roper survived for eighteen to twenty-four hours after the sodomy occurred, and none of these wounds were inflicted post-mortem. No single wound was fatal. Instead, Roper died from the sum total of his injuries, apparently shortly after he was struck with the mirror and the vase on the morning of March 8.

As these events transpired, Dickerson made several phone calls to various people during which he discussed what he was doing to Roper. Many of them were to Dickerson's girlfriend, and she managed to record one of them containing his description of the sodomy and even Roper's own confirmation of what was happening. Dickerson also confirmed the sodomy, as well as the burning of

2

Roper's scrotum, over the phone to another friend. In a later call to that same friend, he said that Roper was "gone." However, he told a different friend that Roper was all right but that Dickerson needed to run.

Dickerson and Armon wrapped Roper's semi-clothed body in a blanket and dumped it in the vacant townhouse next to Armon's. Dickerson then changed clothes and fled. Armon and [his girlfriend] attempted to clean Armon's house, but they abandoned it upon realizing their efforts would be futile. That same day, a woman who was planning to rent the vacant townhouse entered and discovered Roper's bloodied and mutilated body.

Dickerson was arrested on March 11, 2006, and indicted for murder, kidnapping, and criminal sexual conduct.

*State v. Dickerson*, 716 S.E.2d 895, 898–99 (S.C. 2011); [ECF No. 20-22 at 215–16].

Dickerson proceeded to trial before a Charleston County jury in April 2009. The Honorable R. Markley Dennis presided. Dickerson's defense team included attorneys Jeffrey P. Bloom and C. Andrew Carroll. The State was represented by Ninth Circuit Solicitor Scarlett Wilson, along with Chief Deputy Solicitor Bruce Durant and former Assistant Solicitor Rutledge Durant. The jury found Dickerson guilty of all three charges and found three statutory aggravating circumstances supporting a sentence of death. After the jury's findings, Judge Dennis sentenced Dickerson to death for Roper's murder and thirty years' incarceration for each of the other crimes.

Represented by Bloom and two Appellate Defenders, Dickerson filed a timely appeal raising four separate issues. [ECF No. 23-1 at 2–3.] After full briefing and oral argument, the South Carolina Supreme Court affirmed the trial court in all respects. *State v. Dickerson*, 716 S.E.2d 895 (S.C. 2011); [ECF No. 20-22 at 215–23]. Dickerson then unsuccessfully sought rehearing in the South Carolina Supreme Court, ECF No. 23-5, and certiorari in the United States Supreme Court, ECF No. 23-9.

Next, Dickerson applied for post-conviction relief ("PCR"). [ECF No. 20-22 at 224 through ECF No. 20-23 at 30.] He was represented throughout his PCR proceedings by attorneys Elizabeth

3

Franklin-Best and E. Charles Grose, Jr., both experienced capital defenders. The PCR court held five separate evidentiary hearings, along with multiple other hearings concerning funding, discovery disputes, and other motions. In addition, both parties submitted post-trial briefs. [ECF No. 20-40 at 257 through ECF No. 20-41 at 27.] The PCR court denied relief by written order dated June 26, 2018. [ECF No. 20-41 at 29–107.] Dickerson moved the court to reconsider its order pursuant to Rule 59(e), SCRP. [ECF No. 20-41 at 110–22.] The PCR court denied Dickerson's motion but filed an amended order with corrected section headings on July 25, 2018. [ECF No. 20-42 at 34–35 (order denying Rule 59(e) motion), 36–113 (amended order denying post-conviction relief)[1].]

Dickerson filed a timely, counseled appeal, which the South Carolina Supreme Court denied. [ECF No. 22-5.] The court also denied Dickerson's request for rehearing. [ECF No. 22-7.] Dickerson then sought a writ of certiorari in the United States Supreme Court on three of his PCR appellate issues. [ECF No. 61-1.] The Court denied Dickerson's petition on June 13, 2022. [ECF No. 61-4.]

Dickerson initiated the current action on October 13, 2021, after the conclusion of his state court proceedings and while seeking review from the United States Supreme Court. [ECF No. 1.] After preliminary proceedings in this court, Dickerson filed a second PCR action in state court seeking revised proportionality review. [ECF No. 61-6.] To allow Dickerson to fully exhaust any potential state court remedies, this court stayed his federal habeas action pending a final decision in his attempt at state collateral relief. [ECF No. 41.]

---

[1] An identical copy of the amended order is located in the record at ECF No. 21-138. For the remainder of this order, the court will cite to that copy.

In response to Dickerson's second PCR application, the State filed a Petition for Writ of Prohibition in the South Carolina Supreme Court, arguing Dickerson's claim was not appropriately before the circuit court. [ECF No. 61-9.] The South Carolina Supreme Court agreed and found Dickerson's claim was more properly the subject of a habeas petition in the court's original jurisdiction. [ECF No. 61-12.] In accordance with the court's order, Dickerson filed a petition for habeas corpus in the state supreme court's original jurisdiction seeking a new proportionality review of his sentence. [ECF No. 61-15.] The state court denied the petition on September 12, 2023. [ECF No. 61-18.] On September 21, 2023, this court lifted the stay of Dickerson's federal habeas action. [ECF No. 60.]

Dickerson alleges the following grounds for relief:

**Ground I:**    Mr. Dickerson was denied his Eighth and Fourteenth Amendment rights to due process and equal protection when the prosecution violated *Batson v. Kentucky* and committed prosecutorial misconduct by improperly striking qualified black citizens from the jury venire.

**Ground II:**    Mr. Dickerson was denied his Sixth, Eighth, and Fourteenth Amendment right to the effective assistance of counsel when trial counsel failed to fully develop, investigate, and present available evidence to support their *Batson* objection.

**Ground III:**    In violation of the Sixth, Eighth, and Fourteenth Amendments, appellate counsel were ineffective for failing to raise Mr. Dickerson's meritorious *Batson* claim.

**Ground IV:**    In violation of the Sixth, Eighth, and Fourteenth Amendments and *Strickland v. Washington*, trial counsel were ineffective when they failed to uncover and present mitigating evidence of Mr. Dickerson's significant brain damage due to childhood lead exposure.

**Ground V:**    The trial court violated Mr. Dickerson's Eighth and Fourteenth Amendment right to present relevant mitigating evidence when it refused to allow his cousin to testify about the negative impact his execution would have on the Dickerson family, which in turn would have illuminated relevant aspects of William's character.

5

**Ground VI:**    In violation of the Sixth, Eighth, and Fourteenth Amendments, and *Brady v. Maryland*, *Giglio v. U.S.*, and *Napue v. Illinois*, the Solicitor's Office and its agents withheld material, exculpatory evidence from Mr. Dickerson, knowingly presented false testimony, and failed to correct false testimony.

**Ground VII:**   Mr. Dickerson's Eighth and Fourteenth Amendment rights to due process and a reliable capital trial were violated when the trial court refused to instruct the jury on the lesser offense of accessory after the fact of murder, since there was evidence from which a reasonable juror could have concluded that Mr. Dickerson did not commit the murder [him]self.

**Ground VIII:**  The Solicitor's willingness to accept a sentence of life without parole in exchange for a guilty plea renders the death penalty unconstitutional, and trial counsel were ineffective for failing to raise an objection on this basis at trial.

**Ground IX:**    Mr. Dickerson's Sixth, Eighth, and Fourteenth Amendment rights to due process and a fair and impartial jury were violated when the trial court failed to disqualify a juror who said they would automatically vote for the death penalty if the State proved an aggravating circumstance, and would shift the burden to the defense to show that a death sentence was not warranted.

**Ground X:**     Mr. Dickerson's Sixth, Eighth, and Fourteenth Amendment rights to the effective assistance of counsel and a fair, non-arbitrary capital trial were violated when his trial counsel failed to object to a closing argument by the prosecutor that diluted the jurors' sense of responsibility for the death verdict.

**Ground XI:**    Mr. Dickerson's Eighth and Fourteenth Amendment rights to due process, equal protection, and non-arbitrary death sentencing require the application of South Carolina's new proportionality review standard to his case, as announced by the South Carolina Supreme Court in April 2022 in *Moore v. Stirling*.

**Ground XII:**   Mr. Dickerson's death sentence is disproportionate in violation of the Eighth and Fourteenth Amendments.

*See* ECF Nos. 33, 62.

## LEGAL STANDARDS

6

## I.     Habeas Corpus

### A.     Standard for Relief

Claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). Section 2254(d) codifies the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014) (stating "'[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond and possibility of fairminded disagreement.'" (quoting *Harrington*, 562 U.S. at 103)).

Therefore, when reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410 (2000); *see also White*, 572 U.S. at 419 (describing an "unreasonable application" as "objectively

unreasonable, not merely wrong" and providing that "even clear error will not suffice" (internal quotation marks and citation omitted)). Moreover, review of a state court decision does not require an opinion from the state court explaining its reasoning. *See Harrington*, 562 U.S. at 98 (finding "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court). If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. *Id.* Pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. *Id.* at 102. In addition, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. § 2254(e)(1).

### B.    Procedural Default

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), *abrogated on other grounds by United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011); *see also In re Exhaustion of State Remedies in Criminal & Post-Conviction Relief Cases*, 321 S.C. 563, 471 S.E.2d 454 (1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies"). To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal

principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted).

Generally, a federal habeas court should not review the merits of claims procedurally defaulted (or barred) under independent and adequate state procedural rules. *Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008). For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### C.     Ineffective Assistance of Counsel

When claiming habeas relief due to ineffective assistance of counsel at trial, a petitioner must show (1) that his trial counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The Court must apply a "strong presumption" that counsel's representation fell within the "wide range of reasonable professional assistance," and the errors must be "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104. This is a high standard, one in which a habeas petitioner alleging prejudice must show that counsel's errors deprived him "of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. That the outcome would have been "reasonably likely" different but for counsel's error is not dispositive of the "prejudice inquiry." Rather, the Court must determine whether the result of the proceeding was fundamentally unfair or unreliable. *Harrington*, 562 U.S. at 104–05; *Strickland*, 466 U.S. at 694.

9

The Supreme Court has cautioned that while "'[s]urmounting *Strickland*'s high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). When evaluating an ineffective assistance of counsel claim, the petitioner must satisfy the highly deferential standards of 28 U.S.C. § 2254(d) and *Strickland* "in tandem," making the standard "doubly" difficult. *Id.* In such circumstances, the "question is not whether counsel's actions were unreasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s 'deferential standards.'" *Id.*

Courts are reluctant to characterize tactical or strategic decisions by trial counsel as ineffective assistance. *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002). A "strong presumption" exists that counsel's actions were the function of trial tactics and not "sheer neglect." *Harrington*, 562 U.S. at 109. This rule, however, is not absolute where the purported strategic decision is based upon an error or ignorance of the law by trial counsel. *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (omissions based upon "oversight, carelessness, ineptitude or laziness" cannot be explained as "trial strategy"); *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) (a strategic choice made without a professionally competent investigation of the Petitioner's options is "erected upon . . . a rotten foundation" and is not entitled to deference).

## II.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine"

if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of proving to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position cannot withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, cannot preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

## I.    Procedural Default Analysis

Respondents allege Grounds III, VI, and VIII were not fairly presented to the state courts and are procedurally barred from federal habeas review. [ECF No. 79 at 3.] The court agrees.

Dickerson initially raised Ground III—his allegation that his appellate counsel was ineffective for failing to challenge the trial court's ruling on trial counsel's *Batson* motion—to the PCR court, but the court found Dickerson abandoned that claim by failing to present evidence or

11

argument at the evidentiary hearings and omitting the claim from his Post-Hearing Brief. [ECF No. 21-138 at 15–16.] Dickerson admits this claim was abandoned and offers no explanation as to how this court could properly reach the merits of his argument. *See* ECF Nos. 33 at 43 (admitting the claim was abandoned and providing only a brief summary of his allegation, along with the legal standard for evaluating ineffective assistance of appellate counsel); 93 at 1 (stating he "rests on his previously submitted pleadings" for Ground III). As Dickerson has not shown cause and prejudice, Ground III remains procedurally defaulted and barred from review.

In Ground VI, Dickerson alleges "the Solicitor's Office and its agents withheld material, exculpatory evidence from [him], knowingly presented false testimony, and failed to correct false testimony" in violation of the Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*,[2] *Giglio v. United States*,[3] and *Napue v. Illinois*.[4] [ECF No. 33 at 54.] Dickerson admits he did not raise this claim to the state courts and is presenting it here for the first time. *Id.* at 54 n.38. Respondents assert that this ground is procedurally defaulted and that Dickerson cannot overcome the default because the basis for the claim was available as early as 2009, and he had a full opportunity to raise and litigate it during his PCR proceedings but did not do so. [ECF No. 79 at 55.]

Dickerson believes his codefendants received favorable treatment in exchange for their testimony at his trial. [ECF No. 33 at 54.] Prior to trial, Dickerson's counsel filed a Motion to Reveal the Deal and a separate Motion to Produce and Compel Disclosure seeking information on any plea bargains or agreements between the State and Dickerson's codefendants. *Id.* In response, the Solicitor's Office provided copies of signed proffer agreements. *Id.* At trial, the three

---

[2] 373 U.S. 83 (1963).
[3] 405 U.S. 150 (1972).
[4] 360 U.S. 264 (1959).

codefendants testified they had not entered into formal agreements with the State, but some hoped the State would consider their cooperation. *Id.* at 55. After Dickerson's trial, all three codefendants received what Dickerson argues was clearly favorable treatment. *Id.* at 55–59. He posits that sequence of events "suggests strongly that" his codefendants did, in fact, "have unwritten (and undisclosed) agreements with the State for more lenient treatment in exchange" for their testimony. *Id.* at 55. Dickerson continued to pursue this theory during his PCR proceedings by attempting to subpoena the Solicitor's files on each of the codefendants, but the PCR court refused to compel production. Accordingly, Dickerson alleges he is not at fault for the procedural default; rather, he was prevented from pursuing this claim by an external factor—the State's withholding of material evidence. [ECF No. 93 at 73–75.] He further alleges any prejudice from the default would be established through a finding that the withheld information was material under *Brady*. *Id.* at 75.

Dickerson had the opportunity for full civil discovery during his PCR proceedings, and, to the extent he disagreed with the PCR court's rulings on his discovery motions, he had a full opportunity to challenge those decisions on appeal. Dickerson also had the opportunity to ask Solicitor Wilson about the alleged deals both on the stand during the PCR evidentiary hearing and during a deposition. Dickerson did not avail himself of these opportunities. Now, as previously explained in this court's order on the parties' discovery motions, Dickerson has failed to show good cause for discovery of the alleged materials under the federal habeas standards or compliance with § 2254(e). *See* ECF No. 102 at 6. Accordingly, this court will not order production, and the materials at issue are not available for this court's review. Those failures are attributable to Dickerson, not the State, and are ultimately the cause of this ground's default. Dickerson also fails to show prejudice because the alleged deals with the codefendants are not before this court for

review, and Dickerson's pure speculation about their existence and substance cannot demonstrate their materiality.  Ground VI remains defaulted and subject to summary dismissal.

In Ground VIII, Dickerson alleges violations of his Sixth, Eighth, and Fourteenth Amendment rights based on the Solicitor's willingness to accept a plea deal prior to trial and trial counsels' failure to use that offer to argue against the death penalty.  [ECF No. 33 at 61.]  Dickerson admits this claim was not raised to the state courts.  *Id.* at 61 n.42.  Despite acknowledging that he failed to present Ground VIII to the state courts, Dickerson offers no argument in support of cause and prejudice to overcome the clear default.  *See* ECF Nos. 33 at 61–62 (arguing the merits of the claim); 93 at 1 (stating he "rests on his previously submitted pleadings" for Ground VIII).  As Dickerson has not shown cause and prejudice, Ground VIII remains procedurally defaulted and subject to summary dismissal.

## II.    Grounds I & II – The Surviving *Batson* Claims

Dickerson raised all three of his *Batson* claims in his PCR application and engaged in extensive related discovery and evidentiary presentation.  *See* ECF No. 21-138 at 6–9 (summarizing the procedural history of Dickerson's jury selection claims, including presentation of two expert witnesses, depositions of those witnesses and Solicitor Wilson, motions to compel, FOIA requests, other discovery motions, and multiple hearings).

Both parties agree the PCR court unequivocally found Dickerson's freestanding *Batson* claim—the claim presented in Ground I—procedurally barred from consideration. *See* ECF Nos. 33 at 17 n.6; 79 at 34.  The PCR court explained,

> Because a *Batson* motion was made at the 2009 trial, the precise and only claim available is one of ineffective assistance of counsel. . . . Applicant's further allegation that he "was denied his rights to due process and equal protection under the laws in violation of the Fifth and Fourteenth Amendments to the United States Constitution [when] [t]he Ninth Circuit Solicitor's Office improperly struck

14

qualified African-Americans from the jury venire," is not cognizable as that is a direct appeal issue.  Review of that claim is barred by the *Simmons*[5] rule.

[ECF No. 21-138 at 20; *see also id.* at 6 (recounting Respondent's motion to strike the freestanding claim and the court's prior ruling that "'Petitioner is asserting his *Batson* claim as part of his ineffective assistance of counsel claim'" and that it is, thus, "'not a freestanding claim and is a proper claim in this post-conviction relief matter'"), 13–14 (listing surviving PCR allegations, all of which concern ineffective assistance of counsel), 28 (noting the only cognizable claim rests on the sufficiency of trial counsel's *Batson* motion).][6]  Despite repeated, definitive findings that the freestanding claim was not cognizable, the PCR court engaged in a detailed analysis of that claim's merits.  *See id.* at 29–47.  Accordingly, the court will take the "prudent course" and also address the merits of Ground I.  *Stanko v. Stirling*, 109 F.4th 681, 686 n.1 (4th Cir. 2024) (noting the "prudent course" where the state PCR court addressed the merits of a defaulted claim was to "follow the lead of the state courts and address the issue on the merits"); *Lawrence v. Branker*, 517 F.3d 700, 714–15 (4th Cir. 2008) (considering the merits of a habeas claim where the state court held the claim both procedurally defaulted and meritless).  However, like the PCR court, the court limits its analysis of the underlying *Batson* claim to an equal protection framework and the interplay between Dickerson's freestanding equal protection claim and his cognizable ineffective assistance of counsel claim, presented in Ground II.

In Ground II, Dickerson alleges his trial counsel was ineffective for failing to "fully develop, investigate, and present available evidence to support their *Batson* claim."  *See* ECF No.

---

[5] Under *Simmons v. State*, 215 S.E.2d 883, 885 (S.C. 1975), "[e]rrors in a petitioner's trial which could have been reviewed on appeal may not be asserted for the first time, or reasserted, in post-conviction proceedings."

[6] In addition, although Dickerson claims an Eighth Amendment violation in his federal habeas petition, he raised only the Fifth and Fourteenth Amendments in his PCR application.  *See* ECF No. 20-23 at 28.  Thus, Dickerson's Eighth Amendment claim is procedurally defaulted.

33 at 41. Dickerson argues counsel erred by failing to obtain and/or present: (1) "evidence of the State's discriminatory strikes that was readily available from the voir dire and juror questionnaires"; (2) "readily available evidence of Solicitor Wilson's history of discriminatory challenges"; (3) "evidence of the SCCPC's training materials, which encouraged and approved of South Carolina solicitors relying on race when selecting juries," and (4) "criminal history records of jurors that would have allowed them to demonstrate the State's disparate treatment of black and white jurors with similar criminal histories." [ECF No. 33 at 41–42.] He further argues he suffered prejudice because a reasonable probability exists that the trial court would have granted counsels' *Batson* motion had counsel presented this evidence and engaged in a more thorough comparative juror analysis. *Id.* at 42–43. Respondents contend the PCR court's detailed discussion of this issue correctly applied *Strickland* and was well-supported by the record. [ECF No. 79 at 43–47.]

## A.    Background

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). *Batson v. Kentucky* established a three-step evidentiary framework for evaluating claims of discrimination in jury selection. 476 U.S. 79, 93–98 (1986).

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder*, 552 U.S. at 476–77. Because Dickerson's trial counsel made a *Batson* challenge, and the Solicitor offered race-neutral explanations, only *Batson*'s third step is at issue. "That step turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state

court factual findings unless we conclude that they are clearly erroneous." *Foster*, 578 U.S. at 500 (quoting *Snyder*, 552 U.S. at 477).

Jury selection in Dickerson's trial was a prolonged undertaking that proceeded in phases. *See* ECF No. 20-1 at 280 (jury qualification begins) through ECF No. 20-9 at 307 (jury selection ends). In accordance with South Carolina statute, the State was allotted five peremptory strikes, and the defense was given ten. *See* S.C. Code Ann. § 14-7-1110. The defense used all ten of its strikes on White jurors. The State used four of its five strikes, all on Black jurors. Ultimately, the seated jury included three Black jurors.

After the parties agreed on twelve jurors and four alternates, Judge Dennis entertained motions from both sides. [ECF No. 20-9 at 307–08.] Pursuant to *Batson*, Dickerson's counsel challenged the Solicitor's strikes of three Black female jurors. *Id.* at 308. The Solicitor responded with the following explanations. Regarding Juror Number 10,[7] she explained,

> juror ten was a CNA . . . who worked from 11:00 to 7:00 and I recall that she had an issue if it would conflict with her employment. I had that concern. Also she is a single mother with two children and she would be missing work throughout the week. I believe at one point she said that she would consider the death penalty but at another point she couldn't vote for it.

---

[7] Consistent with this district's policies and procedures for electronic case filing, the court will not identify any juror by name, but will, instead, refer to the juror's number herein. *See* Electronic Case Filing Policies and Procedures District of South Carolina 13.4.2 ("To protect personal privacy and other legitimate interests, . . . all personal information identifying a juror or potential juror must be redacted."). Here, the court uses each juror's selection pool number to correspond with Judge Dennis's rulings on the *Batson* challenges. However, each juror was assigned two different numbers during the selection process—a general juror number and a selection pool number. To avoid future confusion, the court notes Juror Number 10 is also referred to in the record as Juror Number 101, Juror Number 11 is also referred to as Juror Number 92, and Juror Number 16 is also referred to as Juror Number 315.

*Id.* at 308–09.  The Solicitor said there were no other selected jurors who were single mothers or certified nursing assistants.  *Id.* at 309.  Judge Dennis found the Solicitor's reasons both race- and gender-neutral and not pretextual.  *Id.*

Regarding Juror Number 11, the Solicitor explained that she had "a number of charges for prostitution, a charge for shoplifting," and a concealed weapon charge.  *Id.* at 310.  The Solicitor did not know of any other juror with a prior arrest and certainly "[n]ot that many or not for those things."  *Id.*  Judge Dennis found the Solicitor's reasons both race- and gender-neutral and not pretextual.  *Id.*[8]

### B.    The PCR Court's Analysis

The PCR court began by defining which claims and evidence were available for review and under which legal standards.  [ECF No. 21-138 at 20–29.]  As noted above, the court concluded Dickerson's freestanding *Batson* claim was "not cognizable" and the only claims ripe for consideration were the three related allegations of ineffective assistance of trial counsel.  *Id.* at 20–21.  Moving on to the evidence, the court found irrelevant any information not available to trial counsel at or before Dickerson's 2009 trial.  *Id.* at 22.

The court also found irrelevant a jury strike analysis from the 2004 trial of Jelal Beyah.  *Id.*  In response to a *Batson* motion during jury selection for Beyah's trial, the trial judge found Solicitor Wilson had given a pretextual explanation for striking a Black juror.  *See* ECF No. 20-42 at 178.  The PCR court found Dickerson's "[r]eliance on *Beyah* to establish some sort of pattern is suspect for its isolated nature."  [ECF No. 21-138 at 22.]  The court focused its analysis on the *Batson* motion made in Dickerson's trial, finding "[a]ny reference to other unrelated cases will

---

[8] Trial counsel also challenged the Solicitor's strike of Juror Number 16, but Dickerson abandoned any challenge regarding that strike in his post-hearing PCR brief and PCR appeal.  *See* ECF No. 22-2 at 14.

never affect, inform, or alter the record made at the 2009 trial as to the prosecution's reasons for the strikes." *Id.*

The PCR court also found irrelevant The Prosecutor's Handbook and other prosecutorial training materials.[9] *Id.* at 23–25. The PCR court relied heavily on the South Carolina Court of Appeals' then recent decision in *State v. Daise*, 807 S.E.2d 710, 720–21 (S.C. Ct. App. 2017). *Id.* In *Daise*, prior to trial and in apparent anticipation of a *Batson* challenge, the defendant's trial counsel subpoenaed the South Carolina Commission on Prosecution Coordination "to provide '[a]ll documents regarding jury selection, including but not limited to training documents, training agendas, manuals, policy statements or . . . advisements, correspondence with current or former prosecutors and circuit judges.'" 807 S.E.2d at 720. In addition, "the circuit court had received expert testimony from a statistician who indicated that in [that county], African-American males were struck at a rate four and a half times higher than Caucasian males." *Id.* The trial and appellate court reviewed the subpoenaed materials in camera and found that, not only were they generally protected work-product, but they "revealed nothing encouraging prosecutors to strike jurors for impermissible reasons—race-based or otherwise." *Id.* The Court of Appeals described the materials as providing general guidance on how to evaluate jurors and even containing statements like "the critical question is whether or not a juror can give both the State and the defendant a fair trial" and "the repeated caution: 'DO NOT RELY ON STEREOTYPES & PREJUDICE.'" *Id.* at 720–21. The Court of Appeals thus upheld the trial court's in camera review of the materials and quashing of the subpoena. *Id.* at 721. The PCR court found *Daise* "directly on point and against [Dickerson's] position." [ECF No. 21-138 at 23.]

---

[9] The court noted these materials, although referenced in Dickerson's post-hearing brief, had "been ruled work-product not available for production and/or privileged and held under seal." *Id.* at 22.

Regarding available evidence, the PCR court concluded, "[t]he evidence that is relevant to this Court's review remains in the form of testimony presented at each installment of the PCR hearing to the extent it pertains to Applicant's trial counsel's performance, any alleged prejudice derived therefrom, and any evidence which was discoverable at or before the time of [Dickerson's] May 2009 trial." *Id.* at 25.

The court then explained that Dickerson's claim was governed by *Strickland*, but that the "*Batson* procedure [was] certainly relevant to" the court's "determination of whether trial counsel rendered deficient performance and any prejudice derived therefrom." *Id.* at 26. The court accurately summarized applicable *Batson* precedents, describing the required three-part procedure and noting that a *Batson* violation offends the Equal Protection Clause. *Id.* at 26–28. The PCR court concluded "[t]he cognizable claim rests on the sufficiency of the *Batson* motion made at trial" and that, to succeed on the claim, Dickerson must also show *Strickland* prejudice. *Id.* at 28.

Next, the PCR court evaluated the merits of Dickerson's freestanding *Batson* claim. The court first noted legal precedent requiring "great deference" to the trial court's finding regarding the credibility of a prosecutor's explanation for a peremptory strike. *Id.* at 29–30. The court then looked to Solicitor Wilson's own testimony at the PCR hearing that she had never trained an attorney to strike on the basis of race or gender, did not believe it would be morally sound to do so, and did not consult any educational materials when preparing for jury selection in Dickerson's trial. *Id.* at 30–31. The court found Solicitor Wilson's testimony contradicted Dickerson's position and was consistent with the trial record in terms of her stated reasons for the strikes, the trial court's ruling that those reasons were not race-motivated, and defense counsel's decision not to push the issue. *Id.* at 31.

The PCR court then undertook its own comparative juror analysis and review of the *Batson* hearing, finding "[t]here is no inconsistency or factual error to indicate pretext" and that Dickerson failed to present any evidence undermining the trial court's findings. *Id.* at 31–39.

Regarding Dickerson's introduction of and reliance on statistical analysis purporting to show a pattern of racial discrimination, the PCR court found such "bare statistics" fell "outside the zone of relevancy" to the "step three analysis at issue." *Id.* at 39–40; *see also id.* at 46 (finding "[r]aw statistics simply do not apply" to the third step of the *Batson* analysis and gathering cases). The court examined Dickerson's statistical evidence and found it failed to account for relevant variables and context. *Id.* at 40–44. The court also noted state precedent discounting the relevance of "statistical patterns in post-conviction relief actions designed to focus on real errors and actual prejudice." *Id.* at 44–46 (discussing *Thompson v. Aiken*, 315 S.E.2d 110, 111 (S.C. 1984)). That, in the court's view, comported with the United States Supreme Court's view that a collateral or appellate *Batson* review must be an individualized and fact-intensive inquiry. *Id.* at 45–46 (citing *Davis v. Ayala*, 576 U.S. 257 (2015); *Johnson v. California*, 545 U.S. 162, 172 (2005) ("The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.")). The PCR court concluded its discussion of Dickerson's statistical evidence by finding its approach did not stray from the Supreme Court's analysis in *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005), because in *Miller-El*, the Court acknowledged the statistical implications but found comparative juror analysis "[m]ore powerful" evidence, especially at *Batson*'s third step. *Id.* at 47. The court thus found Dickerson's "reliance on bare statistics [was] misplaced." *Id.*

The PCR court then turned to Dickerson's ineffective assistance of counsel argument. Going back to what the court had identified as the pertinent issue—the sufficiency of counsel's

*Batson* motion—the court found Dickerson failed to show deficient performance because his trial counsel would not have been entitled to the juror's criminal history information under state precedent or the prosecutorial training materials because they were privileged and protected. *Id.* at 47–50.

> The court concluded,
>
> The record supports defense counsel made the *Batson* motion in furtherance of his client's right [to] equal protection simply not knowing the precise reason for the strikes. When the reasons were offered, he could determine, as is supported by the record, there was no argument for pretext to be made which is exactly what the trial record reflects.
>
> Additionally, no prejudice flows from any juror-related claim. For all the reasons discussed heretofore, Applicant was not denied equal protection as he was tried by a qualified jury and because the basis for the strikes exercised by the Solicitor befit the known Constitutional requirements of jury selection.
>
> The reasons for the Solicitor's strikes have not been hidden nor are they suspect. The reasons for the strikes have been a matter of record[] since the 2009 trial. The selection shows careful consideration by both parties, strikes exercised by both parties, and a challenge to just three of the Solicitor's strikes. Those strikes were explained to the satisfaction of the trial judge and still remain fully and fairly supported by the trial record. Applicant has shown no deficient performance by defense counsel.

*Id.* at 51–52.

## C.    Discussion

Dickerson alleges the PCR court "misunderstood" six critical points when evaluating the merits of his freestanding *Batson* claim: (1) the significance of the prior finding that the Solicitor had acted in a discriminatory manner during jury selection in Jelal Beyah's trial, (2) the PCR court's authority to consider whether the Solicitor's race-neutral reasons were actually pretext, (3) the significance of prosecutor training materials, (4) the insignificance of the Solicitor's denial that she relied on race, (5) the importance of statistical patterns of racial bias in jury selection, and (6) the irrelevance of defense counsel's conduct as part of the *Batson* analysis. [ECF No. 93 at 37–

49.]  Respondents, understandably, stick to their position that Dickerson's freestanding claim is wholly defaulted.  [ECF No. 98 at 3–12.]  However, Respondents also note that Dickerson's allegations of error mostly express disagreement with the PCR court's assessment of the evidence before it and fail to overcome the presumption of correctness attached to the PCR court's factual findings and credibility determinations.  *Id.* at 8–11.  The court agrees.

Dickerson's presentation of Ground I is a thinly veiled invitation to relitigate his freestanding *Batson* claim—a claim that was exhaustively litigated in his PCR proceedings and is procedurally barred.  The court must decline.  The PCR court, sitting in a position of collateral review and constrained by binding state precedent, correctly zeroed in on the cognizable claim before it—whether Dickerson's trial counsel made a constitutionally deficient error by not pushing their *Batson* challenge to these two strikes further by offering a comparative juror analysis or presenting the trial court with additional evidence.  To fully assess that claim, the court looked to the trial record, PCR testimony, and Dickerson's new evidence.  The court considered each piece of new evidence in that context and weighed whether it would have impacted the trial court's calculation.  The fact that the PCR court assigned different significance to the evidence than Dickerson would have liked is not grounds for federal habeas relief.  *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part.").

Also factoring into the PCR court's decision was the recognition that "[a] trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes[,]" along with the Supreme Court's resulting instruction that, because "these determinations of credibility and demeanor lie

peculiarly within a trial judge's province," "in the absence of exceptional circumstances, [the reviewing court will] defer to the trial court." *Davis v. Ayala*, 576 U.S. 257, 273–74 (2015); *see also* ECF No. 21-138 at 29–30 (PCR order discussing deference owed to the trial court). This court's review of the PCR court's decision is even more constrained. "[E]ven if '[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determinations.'" *Davis*, 576 U.S. at 274 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). "The role of a federal habeas court is to 'guard against extreme malfunctions in the state criminal justice systems,' not to apply de novo review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge." *Id.* at 276 (quoting *Richter*, 562 U.S. at 102–03). Dickerson fails to show such an "extreme malfunction" or offer clear and convincing evidence that the PCR court's consideration of this claim was in any way unreasonable.

Concerning the PCR court's evaluation of his ineffective assistance of counsel claim, Dickerson argues the court failed to address "whether trial counsel were deficient because of their failure to present a comparative juror analysis," and "whether trial counsel were objectively unreasonable when they failed to request and litigate their entitlement to juror criminal background records to aid their *Batson* objections," and relied instead on *Strickland*'s prejudice prong. [ECF No. 93 at 52, 56.] Dickerson further asserts that, because the PCR court had an opportunity to rule on these issues and failed to do so, this court may review his claim de novo. *Id.* This argument lacks legal or factual merit.

First, as discussed above, the PCR court did make findings on the deficiency prong. Second, it is well settled that courts may rest a decision on either *Strickland* prong. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed."); *Merzbacher v. Shearin*, 706 F.3d 356, 365–66 (4th Cir. 2013) (same). And third, on federal habeas review, the deference this court owes to the state court's findings means, "if a fairminded jurist could agree with either" the state court's "deficiency or prejudice holding, the reasonableness of the other is 'beside the point.'" *Shinn v. Kayer*, 592 U.S. 111, 120 (2020) (quoting *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012)).

Regarding the prejudice prong, Dickerson argues that, too, can be reviewed de novo due to the PCR court's unreasonable application of law in evaluating the evidence before it when assessing the freestanding *Batson* claim and that this court should apply a different prejudice standard, asking whether Dickerson has demonstrated that his *Batson* motion would have been successful if the trial court had access to the evidence before the PCR court. [ECF No. 93 at 60.] This argument is equally unpersuasive.

The PCR court evaluated Dickerson's *Batson* claim under the correct legal standards. It appropriately granted the trial court great deference but also undertook a thorough review of the evidence presented throughout the PCR proceedings. Based on this careful review, the PCR court found trial counsel could not have obtained the evidence presented in PCR under local discovery rules and, even if they could have presented the same evidence to the trial court, it would not have altered the outcome of the *Batson* hearing because nothing in that evidence undermined Solicitor Wilson's race-neutral reasons for striking the jurors at issue.[10] Dickerson has not offered clear and

---

[10] Significantly, despite the pages of argument on this issue and emphasis on the importance of comparative juror analysis, Dickerson has not alleged an error in the PCR court's independent comparative analysis. Dickerson's amended petition contains a detailed comparative juror analysis for both challenged jurors. [ECF No. 33 at 30–39.] However, there is no evidence this same argument was before the PCR court, and it is thus not a proper argument for this court's review. *See* ECF No. 20-40 at 265–66 (Dickerson's post-hearing brief offering two similarly situated jurors to Juror Number 10 based only on their "stronger reservations about imposing the death penalty").

convincing evidence contradicting the PCR court's factual findings and credibility determinations at the heart of this claim.  For this simple reason, Dickerson fails to show he is entitled to § 2254 relief on Grounds I and II.

## III.    Ground IV – Mitigating Evidence of Lead Exposure

In Ground IV, Dickerson alleges his trial counsel was ineffective for failing to uncover and present evidence of significant brain damage due to childhood lead exposure and that, if the jury had heard the additional evidence, "there is a reasonable probability that at least one juror would have chosen a life sentence over death."  [ECF No. 33 at 44–52.]  Respondents contend the PCR court's decision on this issue was both a reasonable application of *Strickland* and interpretation of the underlying facts.  [ECF No. 79 at 48–51.]

Under *Strickland*,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes that particular investigation unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgements.

466 U.S. 690–91.  Thus, counsel must conduct a reasonable investigation, one that is thorough enough to make an informed decision regarding which mitigating evidence to present.  In assessing counsel's investigation, a court "must consider an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent

---

In addition, regarding Juror Number 11, having found no error in the PCR court's finding that trial counsel were not entitled to the jurors' criminal histories, this court cannot find counsel were ineffective for not identifying jurors for comparison based on criminal records that were unknown to them.  The court recognizes the defect here, but the core issue lies in the State's criminal discovery procedures, which are outside of this court's purview.

consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2009) (quoting *Strickland*, 466 U.S. at 688, 689).

Further, to establish a Sixth Amendment violation, Dickerson "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To assess that probability, the court must "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

A.     **Evidence Presented at Trial**

Dickerson's defense team included two experienced attorneys who had tried a combined sixteen capital cases. [ECF No. 20-25 at 148, 201.] Bloom, the more experienced of the two, took the lead and focused his attention on the penalty phase while Carroll carefully pieced together evidence to support the team's guilt-phase theory—that Dickerson had merely helped his brother cover up the horrific murder but had not otherwise participated in the crime. *Id.* at 148–49, 168–69. Should the case reach the penalty phase, Bloom aimed to show the jury that Dickerson endured a deprived and abusive childhood, suffered from mental health issues, and was lost in a cocaine-induced psychosis while torturing Roper. *Id.* at 149, 168–69. They hired Vicki Childs and Dale Davis as investigators, both of whom Bloom had worked with before and knew had "a lot of experience." *Id.* at 167.

Dickerson's trial did proceed to sentencing and, through nineteen witnesses, including four experts, the jury heard how Dickerson was born premature, to a mother who was ill-equipped to care for him and an abusive father who spent most of Dickerson's life in prison. Dickerson grew

up in "deplorable conditions," surrounded by drugs, crime, and violence. His mother, Sandra, was mostly neglectful and at times volatile. The defense's social historian, Marjorie Hammock, recounted reports of Sandra hitting Dickerson in the head with a set of keys and kicking him out of the house without any clothes on. *Id.* at 151–53.

Dickerson often ran away, mostly to his grandmother's house. He was diagnosed with major depression at age eleven and was admitted twice to William S. Hall, the state psychiatric hospital, after making suicidal threats. *Id.* at 153–54, 161–62, 167–68. He then spent two years at Tara Hall, a school for troubled boys. *Id.* at 74, 173–76. After Sandra filed a petition to have Dickerson declared ungovernable, Dickerson spent some time in the Department of Juvenile Justice and the Beaufort Marine Institute. *Id.* at 121–23, 179–80. By all accounts, Dickerson did "exceptionally well" in these structured, supportive environments away from his mother.

To explain Dickerson's further descent and what could have possibly led him to torture and mutilate a friend, the defense presented three mental health experts. Each detailed what clinical and forensic psychologist Dr. Mark Cunningham termed "a catastrophically cumulative assortment of risk factors." [ECF No. 20-19 at 304.] Most notable of which was Dickerson's drug use and eventual addiction. Dickerson turned to alcohol and drugs at an early age, even dealing cocaine by age fourteen. By age eighteen, Dickerson regularly and heavily used marijuana, cocaine, and ecstasy. Dr. Alexander Morton, an expert in psychopharmacology, opined that Dickerson had been displaying symptoms of extreme cocaine addiction for weeks prior to the murder. During that period, Dickerson's friends and family observed his increasingly "bizarre" behavior. [ECF No. 20-18 at 138.] Dickerson became paranoid, argumentative, scattered, and hyperactive. *Id.* at 139–43; ECF No. 20-19 at 262–65. He lost weight and began to hallucinate. [ECF No. 20-18 at 140–41.] Dr. Robert Phillips, an expert in forensic psychiatry, described

Dickerson's condition as "cocaine psychosis," resulting from his long-term heavy use of the drug. [ECF No. 20-19 at 259.] All three of the defense's mental health experts agreed that, during the murder, Dickerson was affected by a mental disturbance, had substantially impaired capacity to conform his behaviors, and had impaired mentality. *Id.* at 42–44, 267–68; ECF No. 20-20 at 33–36.

Bloom knew another potential risk factor involved Dickerson's exposure to lead paint throughout his childhood. [ECF No. 20-25 at 206.] Bloom had made a similar argument on behalf of a prior client and was familiar with lead poisoning, its effects, and how to present that information to a jury. *Id.* at 191, 206. He and his investigators acquired all the records they could find documenting lead paint in Dickerson's childhood neighborhood and home and obtained a court order requiring the South Carolina Department of Health and Environmental Control ("DHEC") to provide any records showing Dickerson's, or his brother Armon's, lead exposure levels. *Id.* at 180, 190–91. Bloom provided his mental health experts with the records the team had gathered and retained a neuropsychologist, Dr. Robert Deysach, to perform further cognitive testing to support his argument. *Id.* at 180–81. Unfortunately, all but one of the records showing Dickerson's specific lead exposure level had been destroyed. *Id.* at 191. Then, Dickerson refused to cooperate with Dr. Deysach's testing, despite repeated efforts to convince him the tests could help his case. *Id.* at 182, 194. Bloom set up a blood test for Dickerson prior to trial, but "knew it probably wouldn't show anything because of the passage of time." *Id.* at 192–93. He also considered taking Dickerson for an x-ray fluorescence scan, which would show levels of lead in Dickerson's bones, but he could not find a facility with the necessary equipment in South Carolina and doubted Dickerson could be transported to Boston for the test. *Id.* Bloom consulted with a lead expert, Dr. Herbert Needleman, but without the missing records and Dr. Deysach's testing,

Bloom felt he "didn't have enough to bring Dr. Needleman in to testify" and Dr. Needleman felt he didn't have enough to offer a professional opinion.[11]  *Id.* at 189, 207.  Despite the setbacks, the defense team chose to present the jury with what information they did have.

During the sentencing phase, the defense's social historian, Marjorie Hammock, testified that Dickerson and Armon lived in a home with "extremely high" lead levels for four-to-five years. [ECF No. 20-19 at 141.]   Armon was tested regularly, and his tests consistently showed "abnormally high" lead levels.  *Id.*  Ms. Hammock explained that high lead levels in children can impair their emotional and physical development and cause brain damage.  *Id.* at 142.  She testified that Dickerson had an abnormal EKG while housed at SCDC, which could be further evidence of lead poisoning.  *Id.*

Dr. Cunningham, the defense's clinical and forensic psychology expert, further expounded on the dangers of childhood lead exposure. He informed the jury that, at age eleven, Dickerson's blood lead level was nine micrograms per deciliter, but that his level could have been higher or lower at other times.  [ECF No. 20-20 at 7–8.]  Dr. Cunningham introduced a study showing that children with Dickerson's blood lead level were "forty to fifty percent more likely to end up in criminality as an adult."  *Id.* at 8.  He also showed the jury a chart of Armon's much higher blood levels, resulting "from the same household, around the same paint chips, around the same lead dust."  *Id.* at 8–9.  Dr. Cunningham concluded Armon's elevated levels "raise[d] the implication that the blood levels [Dickerson] would have had at earlier points in his childhood might have been higher, and certainly g[ave] some confirmation to the zone of risk that he liv[ed] in when we talk about lead."  *Id.* at 9.

---

[11] Bloom later produced his email correspondence with Dr. Needleman and offered further testimony on the extent of his investigation.  *See* ECF No. 20-30 at 303–07.

**B.      Additional Evidence Presented in PCR Proceedings**

Dickerson's PCR counsel argued "trial counsel 'unreasonably limited the investigation into Mr. Dickerson's early childhood exposure to lead' by failing to follow up with a preeminent expert in the field, Dr. Herbert Needleman, and by failing to provide subtest results to a neuropsychologist for interpretation, thereby eliminating from the jury's consideration the scientific research demonstrating [Dickerson]'s blood lead level at earlier ages and any related neurotoxic effects." [ECF No. 21-138 at 52.]  In support, they presented two expert witnesses: Dr. Richard Canfield, a developmental psychologist specializing in childhood lead exposure, and Dr. Marlyne Israelian, a developmental neuropsychologist.

Dr. Canfield's presentation provided additional context for Dickerson's one documented lead exposure level.  He described the history of lead in the United States, especially the unrestricted use of lead paint and how children got exposed.  [ECF No. 20-23 at 266–72.]  He also described the particular risks of lead exposure to children and infants, the difference in absorption rates, and how lead is stored in the body.  *Id.* at 271–82.  Dr. Canfield then discussed the health impacts of lead exposure in children and how the accepted definition of "elevated lead levels" has changed over time.  *Id.* at 283–88.  Dickerson's recorded level of nine micrograms per deciliter was far below the standard "elevated level" in 1988, when his test was performed.  *Id.* at 287.  However, the standard changed in 2012 to five micrograms per deciliter, based on new research, some of which was available at the time of Dickerson's trial.  *Id.* at 288–89.

Dr. Canfield's most notable contribution was the introduction of a scientific method to use Dickerson's recorded lead exposure level at age eleven to extrapolate his exposure levels at earlier ages.  *Id.* at 291 through ECF No. 20-24 at 10.  This method produced a chart showing Dickerson's levels would have been above the accepted exposure levels when he was younger.  *Id.*  The

remainder of Dr. Canfield's presentation detailed the health effects of lead exposure and lead poisoning in children, including decreased IQ and frustration tolerance and increased distractibility, dependence, and impulsivity. [ECF No. 20-24 at 10–13.] Dr. Canfield also opined that, even if Dickerson's exposure level was never higher than nine micrograms per deciliter, he would have suffered brain damage. *Id.* at 25–26. He then described a correlation between increased lead exposure and propensity to commit violent crimes. *Id.* at 30–41.

Dr. Israelian reviewed Dickerson's developmental history and performed neuropsychological testing. Based on her assessment, she opined Dickerson suffered from brain damage secondary to lead toxicity. *Id.* at 96. She explained that Dickerson "presented with a pattern of behaviors historically, developmentally, and in his testing . . . that was very consistent with lead neurotoxicity." *Id.* at 99. Dr. Israelian testified to Dickerson's developmental history, covering the same information as witnesses at trial, but observed that many of his behavioral difficulties and medical history could be linked to lead exposure. *Id.* at 100–72. She then explained the testing she performed and how the results were consistent with lead neurotoxicity. *Id.* at 172– ECF No. 20-25 at 62.

## C.    The PCR Court's Analysis

After reciting the relevant legal standards, the PCR court summarized its findings as follows:

> Applicant's proffered mitigation presentation on lead neurotoxicity fails to meet the *Strickland* standard. At the initial installment of the evidentiary hearing, the Court heard from Applicant's experts in detail on lead levels and purported correlative damage to cognitive development (specifically hyperactivity and impulsivity), but the presentation put forth in furtherance of this claim ultimately replicated the mitigation evidence put forward during the sentencing phase of trial, with an added emphasis on lead exposure. Trial counsel added compelling testimony regarding the extent of his investigation into Applicant's known childhood exposure to lead. Defense counsel Jeffrey Bloom testified at two stages of the evidentiary hearing: on December 8, 2015, and on May 13, 2016. His

testimony established that counsel investigated the scientific information proffered as mitigation at this PCR hearing. The totality of the testimony demonstrates that Bloom reasonably decided not to more heavily base his mitigation presentation on childhood exposure to lead because Bloom could not uncover or produce enough evidence to make a more persuasive presentation than was presented on this subject. Applicant fails to demonstrate prejudice flowing from the manner and extent to which his childhood exposure to lead was presented at trial. The mitigation evidence proffered at PCR does not make it more likely than not that the jury would have returned with a recommendation for a different sentence.

[ECF No. 21-138 at 54–55.]

The court meticulously recounted the evidence presented to the jury and that presented at PCR and found Dickerson failed to show either deficient performance or resulting prejudice. *Id.* at 55–66. The court reasoned,

What is clear from the aggregate of the PCR testimony is that trial counsel had access to the basis for the lead poisoning defense and investigated it. Most importantly, Bloom's PCR testimony and his correspondence with Dr. Herbert Needleman notes his awareness of Applicant's childhood lead exposure, the existence of lead in the area where Applicant grew up, and his investigation into the extent or certainty with which he could establish Applicant suffered a physiological deficiency as a result of that exposure. If this Court were to determine that Bloom halted his investigation into the lead poisoning, it must be deemed reasonable based upon information counsel culled from notable experts in the field. Ultimately, the preeminent lead professional in the field at the time, Needleman[,] interjected that he would need more information.

*Id.* at 65–66.

## D.    Discussion

Dickerson argues the PCR court unreasonably found that: (1) the evidence at PCR "ultimately replicated" the evidence at sentencing, (2) trial counsel investigated scientific information related to lead exposure; and (3) trial counsel did not have additional evidence related to lead exposure to present at sentencing. [ECF No. 93 at 63–68.] Again, to succeed on these claims, Dickerson would have to show, "by clear and convincing evidence," 28 U.S.C. § 2254(e), that the PCR court's factual determinations were "objectively unreasonable in light of the evidence

presented in the" PCR proceedings, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[I]t's not enough for a finding to be debatable or even wrong—it must be 'unreasonable' to open the door to habeas relief." *Currica v. Miller*, 70 F.4th 718, 723 (4th Cir. 2023) (quoting *Wood v. Allen*, 558 U.S. 290, 303 (2010)). Dickerson fails to make this showing.

Moreover, the PCR court's analysis did not turn on these three factual findings, either alone or combined. Rather, the court highlighted the following factors as "key" to its analysis.

> Applicant's PCR presentation has not compellingly proffered additional lead-based mitigation in a manner undermining confidence in the jury's sentencing recommendation. The only lead level screening conducted upon Applicant occurred when he was almost 12 years old, and the results, a lead level of 9 micrograms per deciliter, fell below the threshold level for concern applicable in 1988 and even in the 1990s. Key to this Court's analysis is that in 1988, and even through the 1990s, Applicant's only known lead level fell below the standard flagged by the medical community for follow-up. Also key to this Court's analysis is Applicant's lack of cooperation with neuropsychological testing in preparation for trial. Bloom did not abjectly fail to present subtests to a neuropsychologist for review as alleged.

[ECF No. 21-138 at 66.] The PCR court correctly zeroed in on the overall picture of whether trial counsel had engaged in a reasonable investigation into the extent of and possible affects from Dickerson's exposure to lead in his childhood home, finding:

> Therefore, even if Bloom had presented the same testimony at trial as was presented at PCR, it fails to persuasively indicate that the jury would have returned an alternative sentencing recommendation. The evidence on this issue shows that Bloom, a seasoned capital trial attorney, exercised a strategic decision that the pursuit of additional lead neurotoxicity evidence was not a viable defense which could be supported by medical testimony at the time of trial. Instead, Bloom incorporated the known evidence of lead exposure through experts other than those presented at PCR. Given the totality of the foregoing, Applicant cannot meet his burden of showing error-and-prejudice in regards to counsel's investigation and presentation of a defense based on Dickerson's purported childhood exposure to lead.

*Id.*

This court agrees there can be no question that "trial counsel did all that could be expected of them given what they had and undoubtedly conducted a constitutionally sufficient investigation." *Mahdi v. Stirling*, 20 F.4th 846, 902 (4th Cir. 2021). The defense team recognized the potential for a lead-based defense, obtained related housing and medical records, got a court order for even more records, retained a neuropsychologist to conduct related cognitive testing, signed up Dickerson for a blood test, investigated whether they could get Dickerson's bones scanned for latent lead, and engaged with the preeminent expert in the field. That PCR counsel retained two different experts who presented a more robust picture of Dickerson's lead exposure does nothing to diminish trial counsels' efforts. *See Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) ("[C]ounsel is only required to make a reasonable"—not exhaustive—"investigation for possible mitigating evidence"); *McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002) ("[T]he reasonableness of an investigation . . . must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation.").

Dickerson argues the jury "never heard that [his] lead levels were probably 50% above average during the entirety of his childhood; that even [his] lone blood test at age eleven . . . was at a level that was considered by the medical community to be developmentally toxic; and that [his] consistent pattern of cognitive deficits in his childhood records was a virtual 'thumbprint' of toxic lead exposure." [ECF No. 93 at 64.] While the jury may not have heard these exact statements, the larger message was aptly delivered. The lead-exposure evidence played into the story of Dickerson's mental health struggles. Whether the result of lead exposure or not, the jury heard from a small parade of experts that Dickerson suffered from major depression and suicidal ideation at an abnormally young age, was hospitalized because of those struggles, self-medicated

with alcohol and drugs, became addicted to cocaine, and was mentally impaired at the time of the murder. It is unclear how a presentation that more tightly linked Dickerson's mental decline to childhood lead exposure would have substantially altered this picture for the jury.

In addition, Dickerson asserts the PCR court unreasonably applied clearly established federal law when concluding "the evidence presented [at PCR] does not make it more likely than not that the jury would have returned with a recommendation for a different sentence," rather than the standard announced in *Strickland* and *Wiggins*—whether there is "a reasonable probability that at least one juror would have struck a different balance." *Id.* at 68–70 (quoting ECF No. 21-138 at 55). Dickerson argues the court's use of the "more likely than not" standard imposed an inflated burden of proof. *Id.* After a full review of the PCR court's decision, this court is satisfied that the PCR court considered Dickerson's claims under the proper standard. *See* ECF No. 21-138 at 18–19 (explaining that "prejudice may be found in a capital sentencing proceeding 'when there is a reasonable probability that, absent [counsel's] errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"), 52–53 ("When determining if want of mitigation evidence resulted in prejudice, we must determine whether the 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the defendant's] culpability'"), 53 ("Prejudice is therefore determined to exist from the lack of proffered mitigation evidence if trial counsel's 'complete failure to present mitigation evidence undermines confidence in the outcome'"), 66 (finding Dickerson's "PCR presentation has not compellingly proffered additional lead-based mitigation in a manner undermining confidence in the jury's sentencing recommendation"); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) ("This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.").

In addition, having found no error in the PCR court's deficiency holding, any error in its prejudice holding would be "beside the point." *See Shinn v. Kayer*, 592 U.S. 111, 120 (2020) ("[I]f a fairminded jurist could agree with either [the state court's] deficiency or prejudice holding, the reasonableness of the other is 'beside the point.'") (quoting *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012)).

In any case, Dickerson has failed to show, either in the state courts or this court, that there is a reasonable probability that the result of his sentencing proceeding would have been different with the inclusion of the additional evidence presented at PCR. The aggravating evidence before the jury was overwhelming. The jurors learned that Dickerson had a long criminal history and, once incarcerated, had been involved in an attack on detention center officers. [ECF No. 20-17 at 99–170 (testimony about armed robbery crime and conviction), 170–250 (involvement in a police shooting when trying to evade capture), 260–89 (attack on detention center officers).] More importantly, they heard, in exhaustive detail, about the systematic torture Mr. Roper endured. They viewed autopsy photos documenting over 200 individual wounds and listened as an expert described the extent of Mr. Roper's internal injuries. [ECF No. 20-18 at 25–49.] They also heard moving victim impact testimony from Mr. Roper's mother and father. [ECF No. 20-17 at 317 through 20-18 at 23.]

Here, "when considered against the sheer magnitude of the aggravating evidence against" Dickerson, "it is difficult to see the allegedly unreasonable omission of this mitigation evidence [of childhood lead-exposure] as prejudicial." *Plath v. Moore*, 130 F.3d 595, 602 (4th Cir. 1997); *see also Thornell v. Jones*, 602 U.S. –, 144 S. Ct. 1302, 1310–11, 1314 (May 30, 2024) (cautioning federal habeas courts to fully engage in the weighing of mitigating and aggravating factors as required by *Strickland* and to not downplay the evidence in aggravation).

For these reasons, Dickerson fails to show the PCR court's denial of Ground IV was unreasonable in either fact or law, and Respondents are entitled to summary judgement as to this claim.

## IV.  Ground V – The Trial Court's Exclusion of Execution Impact Testimony

In Ground V, Dickerson alleges the trial court violated his "Eighth and Fourteenth Amendment right to present relevant mitigating evidence when it refused to allow his cousin to testify about the negative impact his execution would have on the Dickerson family." [ECF No. 33 at 52.]  Dickerson argues his cousin's proffered testimony would have "illuminated relevant aspects of [his] character." *Id.*  Respondents contend the South Carolina Supreme Court's finding that the testimony crossed the line into impermissible evidence expressing an opinion as to the appropriate penalty was "not an unreasonable application of [United States] Supreme Court precedent." [ECF No. 79 at 53–54.]

### A.  Background

During the penalty phase, Dickerson's cousin, Johnette Watson, testified that she and Dickerson had grown up together and he was "like a brother" to her.  [ECF No. 20-19 at 56.]  She stated Dickerson was not violent as a kid and was protective of her.  *Id.* at 56–57.  Ms. Watson described Dickerson after his release from prison in September 2005 as "positive and motivated . . . to do good in his life."  *Id.* at 57.  She indicated he was spending time with family, had gotten a job and a car, and was dating a woman the family thought was good for him.  *Id.*  Ms. Watson stated things began to head down hill for Dickerson when he started dating a new woman, who got him back into drugs.  *Id.* at 58–59.  At the end of Ms. Watson's testimony, Bloom asked if there was anything she wanted the jury to know about Dickerson.  *Id.* at 62.  Ms. Watson responded, "He's basically a good person.  He got mixed up in the wrong things and I, I beg that you have

mercy on him." *Id.* Bloom then asked, "How would his execution impact . . . your family," immediately prompting an objection from the Solicitor, which the trial court sustained. *Id.*

After an overnight recess, Bloom placed an argument and oral proffer on the record regarding the court's ruling, asserting the testimony would have gone to Dickerson's character. *Id.* at 106–08. He explained,

> [w]hat Ms. Watson would have testified to is that William's death would have had a huge impact on the Dickerson and Watson family, Watson being the maternal side of his family, his cousins. Part of the unique reason for that is that Johnette Watson has lost a brother to homicide recently, within the last year or so, and another cousin of William Dickerson has been the victim of a homicide, I believe about three years ago. So the death of William would exacerbate that. That would have been the extent of her testimony.

*Id.* at 107. The Solicitor countered that the testimony about additional deaths in the family would inject "extraneous, irrelevant matters into the jury's" consideration and that the defense could get in "all that evidence of love and affection, the meaningfulness that the Defendant's life has to" his family, in other ways. *Id.* at 108.

The trial court found as follows:

> Certainly I can . . . possibly connect that right off with how [the deaths of Dickerson's cousins] could have had an influence or affect on Mr. Dickerson and that is certainly relevant as to him and his character, his make up.
>
> I don't have any problem with the door that the courts have used to allow this to enter, this line of questioning. . . . I sustained the objection primarily because courts have recognized that we can't talk about specifically whether [witnesses] like the execution, whether they approve of it and . . . their opinion of whether they believe life would be better than the death sentence is certainly not relevant, that it is not appropriate.
>
> Given those two, my thought process is that it's not any way to do that, because it's not relevant. My concern is primarily, . . . I understand what they're talking about because they're talking about that familial relationship, that the familial relationship is so important that it speaks directly to his character, as to whether they are close. But she testified to that, I think she even said 'I am a cousin but he's like my brother.' That, without saying a lot, probably goes to the height of the

relationship.  It is a credit to her but it's also a credit to him, as to how he treated her.  That evidence is already before the jury.

*Id.* at 109–10.

The South Carolina Supreme Court agreed.  The court acknowledged that "[d]uring the sentencing phase of a capital trial, the defense must be able to present mitigating evidence on 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"  [ECF No. 20-22 at 221 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982)).]  However, the court also recognized that "*Eddings* does not limit a court's ability to exclude evidence not bearing on the defendant's character, his prior record, or the circumstances of the crime as being irrelevant."  *Id.* (citing *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978)).  The court went on to discuss the scope of relevant evidence, noting capital defendants may not "'directly elicit[] the opinion of . . . penalty-phase witnesses about the appropriate penalty,'" or testimony "as to what punishment the jury 'ought' to recommend."  *Id.* (quoting *State v. Wise*, 596 S.E.2d 475, 481 (S.C. 2004)).  However, penalty-phase witnesses may "beg for mercy on [the defendant's] behalf."  *Id.*  The court reasoned, "[w]hether certain evidence is a plea for mercy versus an opinion of what is the appropriate penalty can be a close call and thus is left to the discretion of the trial judge."  *Id.*

With this precedent in mind, the court found:

The thrust of Dickerson's argument is that the emotional impact an execution would have on his family members demonstrates that he has the ability to form cohesive, lasting relationships with others, a trait that reflects positively on his character.  We agree that evidence of a defendant's ability to form positive relationships with others is evidence that *Eddings* renders admissible.  And here, Watson testified without objection to the close bond she shared with Dickerson and how he was like a brother to her.  However, execution impact evidence can easily cross the line from illuminating a defendant's character or a plea for mercy to an opinion of what is the proper punishment.

> Had the court permitted Watson to testify as planned, she would have testified her family lost two members to homicide, her brother as well as another cousin of Dickerson's.  Dickerson's execution would therefore exacerbate the suffering her family has already endured.  This evidence no longer concerns Dickerson's character but rather borders on an opinion that Dickerson should not be executed in order to spare her family the suffering.  Watson's proffered testimony thus strayed from relevant considerations into the realm of an opinion regarding which punishment the jury ought to recommend.

*Id.*

### B.    Discussion

Dickerson lodges his disagreement with the state court, arguing, "[w]hat could be more relevant to a person's character than the way their family would experience their loss?"  [ECF No. 33 at 53.]  While the court appreciates Dickerson's "common sense" argument, *id.*, the legal landscape surrounding execution impact testimony is not quite so simple.

The United States Supreme Court has never spoken on whether execution impact evidence falls into the category of mitigation expressly allowed under *Eddings* and *Lockett*.  However, the Fourth Circuit has ruled on this question and held "to allow evidence about the impact the execution will have upon a third party goes beyond testimony about the defendant's character, prior record, or the circumstances of the crime."  *U.S. v. Hager*, 721 F.3d 167, 195 (4th Cir. 2013); *see also United States v. Umaña*, 750 F.3d 320, 355 (4th Cir. 2014) ("Umaña argues that he should have been allowed to submit evidence regarding the impact that his execution would have on his wife and child. This argument, however, is squarely foreclosed by our decision in *Hager*, 721 F.3d at 194."), *cert. denied*, 135 S. Ct. 2856 (2015).  Other federal courts have reached similar conclusions.  *See, e.g., Stenson v. Lambert*, 504 F.3d 873, 891–92 (9th Cir. 2007); *United States v. Snarr*, 704 F.3d 368, 401 (5th Cir. 2013) (excluding execution impact evidence and explaining that "victim impact evidence fundamentally differs from execution impact evidence, which in no way reflects on the defendant's culpability"); *United States v. Williams*, 18 F. Supp. 3d 1065, 1072

41

(D. Haw. May 7, 2014) ("Even if a witness testifies that he or she does not want to see Defendant executed, it would not be relevant as a mitigating factor to understand what specific impact his execution would have on that witness.").

Dickerson offers no further argument on this issue, instead posturing that Respondents cannot possibly show the excluded testimony does not relate to Dickerson's character. But that is not Respondents' burden under AEDPA's deferential standard. Accordingly, Dickerson fails to show the South Carolina Supreme Court's decision affirming the trial court's exclusion of execution impact testimony was an unreasonable application of clearly established federal law and Respondents are entitled to summary judgment on Ground V.

## V.     Ground VII – The Trial Court's Refusal to Instruct on Accessory After the Fact

In Ground VII, Dickerson alleges his Eighth and Fourteenth Amendment rights to due process and a reliable capital trial were violated when the trial court refused to instruct the jury on the offense of accessory after the fact of murder, "since there was evidence from which a reasonable juror could have concluded that Mr. Dickerson did not commit the murder itself." [ECF No. 33 at 60.] Respondents contend the South Carolina Supreme Court's "opinion shows a reasonable application, indeed an express adoption of the controlling Supreme Court precedent" in *Hopkins v. Reeves*, 524 U.S. 88 (1998). [ECF No. 79 at 56.]

As discussed above, the defense team's guilt-phase strategy was to show Dickerson did not participate in Mr. Roper's murder but did help his brother, Armon, cover it up. During the State's case, Armon admitted to his part in the crime, thus supplying some supporting evidence for Dickerson's defense. *See* ECF No. 20-13 at 54–55, 57 (police found Armon's bloody fingerprints around the apartment and not Dickerson's); ECF No. 20-14 at 79–80, 117, 155, 157 (Mr. Roper was tortured in Armon's apartment, Armon helped dispose of the body); ECF No. 20-15 at 62–63

(Armon cut and kicked Mr. Roper and hit him in the chest with furniture). At the close of the State's case, Bloom argued for the inclusion of a charge on accessory after the fact. [ECF No. 20-15 at 285–87.] Judge Dennis agreed to consider the charge but noted the cases he had reviewed suggested he was only constitutionally required to charge on a lesser-included offense of the greater charge and that accessory after the fact was not a lesser-included offense of murder. *Id.* at 285–87. Bloom renewed his motion after the State rested, *id.* at 305, but Judge Dennis ultimately denied the request.

Pursuant to *Beck v. Alabama*, 447 U.S. 625, 627 (1980), capital defendants are constitutionally entitled to charges on lesser-included non-capital offenses when those charges are supported by the evidence. However, as the South Carolina Supreme Court noted, "[i]t is well-settled that accessory after the fact is not a lesser-included offense of murder in South Carolina." [ECF No. 20-22 at 220 (citing *State v. Fuller*, 552 S.E.2d 282, 284 (S.C. 2001)).] Apparently ceding this point, Dickerson argued accessory after the fact was a "lesser-related" rather than lesser-included offense, and the charge was required based on the interplay between *Beck* and state law granting courts subject matter jurisdiction to hear cases even if the indictment fails to allege all the elements of the offense. *Id.* (citing *State v. Gentry*, 610 S.E.2d 494 (S.C. 2005)). The South Carolina Supreme Court rejected Dickerson's argument and instead expressly adopted the United States Supreme Court's holding that, unlike lesser-included offenses, there is no constitutional requirement to charge a jury on lesser-related offenses. *Id.* at 221 (citing *Hopkins v. Reeves*, 524 U.S. 88, 90–91 (1998)). Applying *Hopkins*, the court found that "[h]ere, permitting the jury to convict Dickerson as an accessory after the fact would permit the jury to find beyond a reasonable doubt elements of a crime the State never sought to prove and Dickerson was not on notice he had

to defend against." *Id.*  The court thus affirmed Judge Dennis's denial of Dickerson's request to charge. *Id.*

In his habeas petition, Dickerson relies solely on *Beck* and fails to discuss *Hopkins*, let alone argue how the state court's application of *Hopkins* was unreasonable.  *See* ECF No. 33 at 61–62.  Because accessory after the fact is not a lesser-included offense of murder in South Carolina, *Hopkins*, not *Beck*, governs Dickerson's claim.  *See Hopkins*, 524 U.S. at 90–91, 97 ("Almost all States . . . provide instructions only on those offenses that have been deemed to constitute lesser included offenses of the charged crime.  We have never suggested that the Constitution requires anything more.  The Court of Appeals in this case, however, required in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some *other* offense—what could be called a 'lesser related offense'—when no lesser included offense exists.  Such a requirement is not only unprecedented, but also unworkable.").  Accordingly, the South Carolina Supreme Court correctly identified and applied the relevant United States Supreme Court precedent and Respondents are entitled to summary judgment on Ground VII.

## VI.     Ground IX – The Trial Court's Failure to Disqualify a Juror

In Ground IX, Dickerson alleges his "Sixth, Eighth, and Fourteenth Amendment rights to due process and a fair and impartial jury were violated when the trial court failed to disqualify a juror who said they would automatically vote for the death penalty if the State proved an aggravating circumstance."  [ECF No. 33 at 62.]  Respondents assert the South Carolina Supreme Court's decision affirming the trial court reasonably applied controlling United States Supreme Court precedent, namely *Wainwright v. Witt*, 469 U.S. 412 (1985), and *Morgan v. Illinois*, 504 U.S. 719 (1992).  [ECF No. 79 at 58.]

Every capital defendant is constitutionally entitled to an impartial jury. *See Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965). "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment" is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). "Under this standard, . . . a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728.

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Id.* at 729. "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper." *Witt*, 469 U.S. at 423. Because a bare record may not offer "unmistakable clarity" as to the juror's views, "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 425–26.

During voir dire, Juror 370 gave contradictory responses as to when he would find death an appropriate punishment and showed some confusion over which party held the burden of proof. *See* ECF No. 20-3 at 57 (identifying himself as the type of juror who could vote for either death or life without parole after considering all of the evidence), 60 (agreeing he would not have a problem actively presuming Dickerson was innocent), 60–61 (agreeing he could follow the court's

instruction that the only party bearing any burden was the State), 63–64 (expressing understanding that, even if aggravating circumstances are found, a death sentence is not required), 69–70 (telling Bloom he would not automatically vote for the death penalty if the jury found Dickerson guilty of murder), 70–71 (saying he would automatically vote for the death penalty if the state proved murder beyond a reasonable doubt), 72 (saying he would automatically vote for the death penalty if the state proved murder and aggravating circumstances), 72–73 (saying he would want to hear all the mitigating circumstances before he could decide whether death was warranted and that he would "certainly" give meaningful consideration to mitigating evidence), 73–75 (agreeing that, if the state proved murder and aggravating circumstances, he would expect the defendant to then convince him not to vote for the death penalty),  77–79 (saying he would follow the judge's instructions concerning the burden of proof), 79 (stating would not automatically vote for the death penalty, even if the state proved murder and aggravating circumstances beyond a reasonable doubt), 80–81 (affirming to Judge Dennis that he could follow the law as stated notwithstanding any personal opinions or beliefs about what the law should be), 81 (reaffirming that he understood Dickerson was presumed innocent and did not have to present any evidence to prove otherwise), 113–14 (again stating he would look to the defense to prove the death penalty was not the right call if the state had proven murder and aggravating circumstances), 114 (clarifying that if the judge instructed him otherwise, he would listen to the judge).

After examination by Bloom, the State, and Judge Dennis, Bloom argued Juror 370 was not qualified and was a "burden shifter" who would look to the defense to prove why Dickerson should not get the death penalty. *Id.* at 115–16.  Judge Dennis found Juror 370 qualified, reasoning,

> I think obviously he demonstrated some personal concept of what the law was but I . . . believe that the young man specifically stated and unequivocally stated that he would follow the instructions.  He demonstrated that in one of his answers to

your question when he said, and I'm paraphrasing what he said, but he said 'that's what I mean, I would want to hear all the circumstances.'

I think while he may be prone for that, I don't think that disqualifies him.

*Id.* at 116.

Considering the issue on direct appeal, the South Carolina Supreme Court summarized Juror 370's testimony and the correct legal standards and found:

Although Juror 370 unquestionably displayed some equivocation on how he might vote should the State prove an aggravating circumstance, the State's rehabilitation revealed this was more the result of a misunderstanding of the trial process than any firmly held belief that he would automatically vote for the death penalty. . . . [T]he one thing he was unequivocal about was that he would follow the law as it was instructed to him by the court. Consistent with *Morgan*, Dickerson was allowed to probe the true nature of Juror 370's beliefs, and that examination produced nothing resembling either a deep-seeded preference for the death penalty or a true belief Dickerson must prove that death is not appropriate.

After a review of the entire voir dire, . . . this in-depth examination produced evidence to support the court's ruling that Juror 370 could be a fair and impartial juror, acting in accordance with the court's instructions and not merely blindly professing that he would do so. The circuit judge was more persuaded by the juror's consistent affirmation he would follow the law and want to hear all of the evidence than by his apparent confusion over the State's burden, and we believe his ultimate determination of Juror 370's qualification to serve is supported by the record.

*Id.* at 216–19, 219–20.

Dickerson does not identify any error in the state court's analysis, instead re-asserting his position that Juror 370 was not impartial, Judge Dennis's failure to excuse him was an abuse of discretion, and a new sentencing hearing is required. [ECF No. 33 at 62–63.] Dickerson's lone disagreement with the state court's decision is not enough to overcome § 2254's deferential standard. Here, the state court conducted a thorough review of Juror 370's voir dire, identified and applied the applicable federal legal standards, and, in accordance with those standards, ensured Dickerson had a full substantive opportunity to examine Juror 370. Once the South Carolina Supreme Court found the trial court followed the correct procedures to test the juror's impartiality,

it appropriately deferred to Judge Dennis's direct observations and impressions of the exchange. This was a textbook application of *Witt* and *Morgan*, Dickerson offers nothing to show otherwise, and Respondents are entitled to summary judgement on this ground.

## VII.    Ground X – Trial Counsel's Failure to Object to Solicitor's Closing Argument

In Ground X, Dickerson alleges his "Sixth, Eighth, and Fourteenth Amendment rights to the effective assistance of counsel and a fair, non-arbitrary capital trial were violated when his trial counsel failed to object to" a portion of the solicitor's closing argument "that diluted the jurors' sense of responsibility for the death verdict."  [ECF No. 33 at 64.]  Respondents assert the PCR court's ruling on this issue "reflects a reasonable application of Supreme Court precedent to the facts of the case."[12]  [ECF No. 79 at 59.]

Specifically, Dickerson contends his trial counsel should have objected to the following portion of the state's penalty phase closing argument:

> The law limits the State's right to seek the death penalty to just a very [few] murders involving aggravating circumstances.  The death penalty is for the worst of the wors[t], for those whose conduct is so over the top that it sets them apart from . . . the rest of the criminals.

[ECF No. 20-20 at 98.]  He asserts these two sentences led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985), thus rendering his sentence unreliable. [ECF No. 33 at 65–66.]

---

[12] In addition, Respondents note Dickerson did not raise an Eighth Amendment argument to the PCR court and that portion of Ground X is therefore defaulted. *Id.* n.27.  Dickerson did not respond to Respondents' assertion of default and, in fact, did not address Ground X at all in his response to the motion for summary judgment.  *See generally* ECF No. 93.  The court agrees any discernable Eighth Amendment claim in Ground X was not fairly presented to the state courts and is procedurally defaulted.

Under the Eighth Amendment, a capital sentencing decision must be rooted in an "individualized assessment of the appropriateness of the death penalty," *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring), based on the "character and record of the individual offender and the circumstances of the particular offense," *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987). Thus, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328–29. However,

> great latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views. . . . To be sure, there are some lines that prosecutors may not cross. But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner.

*United States v. Johnson*, 587 F.3d 625, 632–33 (4th Cir. 2009). Accordingly, even if a prosecutor's closing argument crosses the line into improper, the remarks invoke the Eighth Amendment only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). To establish that a prosecutor's remarks diminished a jury's sense of responsibility for the sentencing decision, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).

The PCR court found that, within the context of the Solicitor's entire argument, the statements stayed within the bounds of permissibility. [ECF No. 21-138 at 69–71.] The court relied on South Carolina jurisprudence defining the limits for solicitors' closing arguments and

trial counsels' PCR testimony wavering on whether the comments were objectionable. *Id.* at 70, 71. The court explained that the Solicitor's comments amounted to an argument that the jury should recommend death, reject any request for mercy, discount the defendant's mitigating evidence, and find the State's aggravating evidence persuasive, all of which were legally sound. *Id.* at 70–71. The court thus concluded trial counsel were not ineffective for failing to lodge a meritless objection. *Id.* at 71.

In his federal habeas petition, Dickerson argues the state court misapplied *Caldwell* by finding the Solicitor's comments did not disarm the jury of its responsibility for the sentencing decision. [ECF No. 33 at 65–66.] Dickerson says nothing, however, of the court's finding that the Solicitor's argument "adhere[d] to the principles stated in" South Carolina's leading cases on the issue and that trial counsel, aware of that law, apparently saw no reason to object. *See* ECF No. 21-138 at 70. The question before this court is not whether the Solicitor's closing remarks violated the Eighth Amendment but whether the state PCR court unreasonably found trial counsel were not constitutionally ineffective for not objecting to those remarks. Dickerson fails to show any unreasonable application of the federal law directly relevant to the state court's decision, and Respondents are entitled to summary judgment on this claim.

## VIII.  Grounds XI & XII – Comparative Proportionality Review Claims

In Grounds XI and XII, Dickerson alleges that the South Carolina Supreme Court violated his Eighth and Fourteenth Amendment rights by refusing to conduct a new proportionality review of his sentence and that his death sentence is in fact disproportionate. *See generally* ECF No. 62. Respondents contend neither claim is cognizable as they turn on matters of state law and because Dickerson is not "in custody" because of the state court's refusal to conduct a second proportionality review. [ECF No. 79 at 60–62.] The court agrees with Respondents.

Under South Carolina law, when a defendant has been convicted of a capital crime and sentenced to death, the Supreme Court of South Carolina shall consider the sentence and determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor"; "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance"; and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed *in similar cases*, considering both the crime and defendant." S.C. Code Ann. § 16-3-25(C)(1)–(3) (emphasis added). The South Carolina Supreme Court conducted this mandated review of Dickerson's sentence on direct appeal and found "the death penalty was warranted in this case." [ECF No. 20-22 at 221–22.] However, the court noted its "concern that restricting [its] statutorily-mandated proportionality review to only similar cases where death was actually imposed is largely a self-fulfilling prophecy as simply examining similar cases where the defendant was sentenced to death will almost always lead to the conclusion that the death sentence under review is proportional." *Id.* at 223.

Ten years later, the court revisited this issue in *Moore v. Stirling* and clarified that "subsection 16-3-25(C)(3) does not limit the pool of comparison cases to only those in which the defendant actually received a sentence of death." 871 S.E.2d 423, 433 (S.C. 2022). The court thus expanded the pool of comparison cases to include those resulting in a life sentence and engaged in a comparative proportionality review of Moore's sentence using that expanded pool. *Id.* at 434–35.

In 2023, Dickerson filed a habeas petition in the South Carolina Supreme Court, alleging his death sentence was disproportionate under the *Moore* standard and requesting time to amend his petition to include records from any additional comparative cases from the expanded pool. *See*

ECF No. 61-15.  After briefing from the State, the South Carolina Supreme Court summarily denied both the petition and Dickerson's request to amend.  [ECF No. 61-18.]

Dickerson now alleges the South Carolina Supreme Court's refusal to reconsider his death sentence against an expanded pool of comparative cases violates his Eighth Amendment right to cruel and unusual punishment.  The Eighth Amendment requires that the death penalty not be imposed in arbitrary and capricious manner.  *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). It is left to the states, however, to determine how to eliminate the risk of arbitrary and inconsistent death sentences.  The states have adopted various statutory schemes, some of which, like South Carolina's, include a provision for comparative proportionality review.  *See Pulley v. Harris*, 455 U.S. 37, 44 (1984).  However, it is well-settled that comparative proportionality review is not constitutionally required.  *Id.* at 50–51; *see also McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (noting proportionality review not constitutionally required where "the statutory procedures adequately channel the sentencer's discretion").  Rather, the Eighth Amendment is satisfied by any scheme that effectively narrows the class of persons eligible for the death penalty by requiring proof of aggravating circumstances, ensuring a sentencing jury has adequate guidance to perform its function, and providing for prompt appellate review.[13]  *Id.* at 47–51; *see also McCleskey*, 481 U.S. at 305–06 ("In sum, our decisions since *Furman* have identified a constitutionally permissible range of discretion in imposing the death penalty").  South Carolina's death penalty statute mirrors those the Supreme Court has upheld in the face of Eighth Amendment challenges, and this court

---

[13] Dickerson argues his federal habeas claim is cognizable because *Moore* involved an interpretation of the Eighth Amendment, as discussed in *Pulley*.  However, the South Carolina Supreme Court noted it was only able to entertain Moore's claim because "[t]he discussion in *Pulley* as to the Eighth Amendment [was] not controlling of a defendant's right to due process under [the South Carolina] state constitution."  *Moore*, 871 S.E.2d at 432.

is unaware of any case finding South Carolina's statute invalid under the federal Constitution, with or without the revised proportionality review scheme.

As there is no federal Eighth Amendment right to comparative proportionality review, there is no corresponding federal habeas claim for a state court's refusal to perform such a review under an otherwise adequate statutory scheme. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Fisher v. Angelone*, 163 F.3d 835, 854 (4th Cir. 1998) ("'[B]asic principles of federalism permit us to review only those state court decisions that implicate *federal constitutional* rights.'" (quoting *Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995)). And there is certainly no cognizable federal habeas claim that a petitioner received a different comparative proportionality review than that now required under state law. *See Pulley*, 465 U.S. at 42 ("[I]f Harris's claim is that because of an evolution of state law he would now enjoy the kind of proportionality review that has so far been denied him, that claim, even if accurate, would not warrant issuing a writ of habeas corpus. Rather, it would appear to be a matter that the state courts should consider, if they are so inclined, free of the constraints of the federal writ."). Accordingly, Dickerson's claim that the state supreme court violated his federal constitutional rights by refusing to review his sentence a second time under a new state law must fail. This court must also decline Dickerson's invitation to engage in its own comparative proportionality review, as "[s]uch a claim is . . . not cognizable on federal habeas review." *Hooks v. Branker*, 348 F. App'x 854, 864 (4th Cir. 2009).

Although created in part to comply with federal constitutional requirements, the parameters of a state's comparative proportionality review are products of state law that this court cannot review, "absent some specific evidence that the review procedures employed by [the state court]

constituted an independent violation of the federal constitution." *Roach v. Angelone*, 176 F.3d 210, 216 (4th Cir. 1999). Dickerson has made no such showing. The court, thus, grants Respondents' motion for summary judgment as to these grounds.

## IX.     Remaining Motions

Respondents have moved to strike various attachments to Dickerson's filings that were not part of the state court record. [ECF Nos. 80, 99.] Accepting these documents would constitute an expansion of the record, and so the court looks to Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts. Rule 7 allows a federal judge to direct the parties to expand the record "[i]f the petition is not dismissed." Rule 7, Rules Governing Section 2254 Cases in the United States District Courts. As the court has found the entirety of the petition subject to dismissal, it will not consider any extra-record evidence, and Respondents' motions are granted.

In addition, Dickerson seeks an evidentiary hearing on Grounds II, IV, and XII. *See* ECF No. 93 at 3–6. Pursuant to 28 U.S.C. § 2254, if a petitioner has properly exhausted his federal habeas claim by "raising it before the state courts in accordance with state procedures," a federal court "may hear his claim, but its review is highly circumscribed." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022); 28 U.S.C. § 2254(d). "In particular, the federal court may review the claim based solely on the state-court record. . . ." *Shinn*, 596 U.S. at 378 (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (finding a federal habeas court's review of an exhausted claim "under [28 U.S.C.] § 2254(d)[] is limited to the record that was before the state court that adjudicated the claim on the merits")).

On the other hand, if a petitioner has not properly presented his federal claim to the state courts and has "failed to develop the factual basis of [that] claim in State court proceedings," the court "may" consider evidence beyond the state court record, but only if the claim relies on (1) "a

'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the United States Supreme] Court, or (2) "'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Shinn*, 596 U.S. at 381–82 (quoting 28 U.S.C. § 2254(e)(2)). If a petitioner's claim falls under one of those two exceptions, the petitioner "also must show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged.'" *Id.* at 381 (quoting 28 U.S.C. § 2254(e)(2)(B)). Only then may the federal court hold an evidentiary hearing "or take any evidence" outside of the state court record. *Id.* However, even if a petitioner clears each of those hurdles, the federal court is not "required" to hold an evidentiary hearing. *Id.* Rather, "the decision to permit new evidence must be informed by [the] principles of comity and finality that govern every federal habeas case." *Id.*

Grounds II and IV—Dickerson's allegations of ineffective assistance of counsel related to the *Batson* motion and investigation of childhood lead poisoning—were raised to and addressed by the state courts. This court's review of those claims is therefore limited to the record before the state courts. Ground XII—Dickerson's allegation that his sentence is not proportionate—is not cognizable on federal habeas review for the reasons discussed above. It is thus not subject to further evidentiary development. Dickerson's requests for an evidentiary hearing are therefore denied.

## CONCLUSION

Accordingly, after a thorough review of the record, the applicable law, and the parties' submissions, Respondents' motion for summary judgement, ECF No. 78, and motions to strike, ECF Nos. 80 & 99, are **GRANTED**. The amended petition and second amended petition, ECF Nos. 33 & 62, are dismissed with prejudice. Further, a certificate of appealability is denied because

Dickerson has failed to make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).[14]

**IT IS SO ORDERED.**

September 24, 2024                              Sherri A. Lydon
Columbia, South Carolina                       United States District Judge

---

[14] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find both that his constitutional claims are debatable and that any dispositive procedural rulings by the district court are also debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the instant matter, the court finds that Petitioner has failed to make "a substantial showing of the denial of a constitutional right."